### STATE *v.* WOOD.

A person indicted for the crime of murder in the second degree is not entitled to be furnished with lists of the government witnesses, or to challenge twenty jurors peremptorily.

The foreman or any member of the grand jury may be called and compelled to testify what a witness stated before the grand jury, for the purpose of contradicting such witness, or for any other purpose, when in the opinion of the court the cause of justice requires it to be done.

When a piece of testimony is offered, the court may in its discretion hear the arguments for and against its admissibility openly in the presence of the jury, or privately in the absence of the jury ; and after the testimony has been ruled in, no exception lies upon the ground that such discussions were in the hearing of the jury.

A physician, testifying as an expert, may give an opinion founded upon his reading and study alone.

An indictment, which charged that the respondent produced an abortion "with a certain instrument to the jurors unknown," is sufficient, and so is the proof if it sustains that charge.

INDICTMENT against Charles P. Wood, alleging that the respondent, at Manchester, on the tenth day of April, in the year of our Lord one thousand eight hundred and seventy-one, at Manchester, in the county of Hillsborough aforesaid, with force of arms in and upon one Elvira Woodward, feloniously, wilfully, and of his malice aforethought, did make an assault, and did then and there feloniously, wilfully, and of his malice aforethought, force, thrust, and strike a certain instrument, to the jurors unknown, which he, the said Charles P. Wood, then and

there had and held in his right hand, up and into the womb and body of the said Elvira Woodward, she, the said Elvira Woodward, being then and there pregnant with child, with a wicked and unlawful intent thereby to cause and procure the said Elvira Woodward to miscarry, by means of which forcing, thrusting, and striking the instrument aforesaid up and into the womb and body of the said Elvira Woodward in the manner aforesaid, the said Elvira Woodward, from the said tenth day of April in the year aforesaid, to the twenty-seventh day of April in the year aforesaid, at said Manchester, in said county of Hillsborough, did languish, and languishing did live; on which said twenty-seventh day of April aforesaid, in the year aforesaid, in the county aforesaid, by means of the forcing, thrusting, and striking the instrument aforesaid up and into the womb and body of the said Elvira Woodward in the manner aforesaid, the said Elvira Woodward died. And so the jurors aforesaid, upon their oath aforesaid, do say, that the said Charles P. Wood the said Elvira Woodward, in the manner aforesaid and by the means aforesaid, then and there feloniously, wilfully, and of his malice aforethought, did kill and murder.

Subject to exception, it was ruled that the respondent was not entitled to twenty peremptory challenges, nor to be furnished with a list of the state's witnesses.

It appeared that Elvira Woodward died at the respondent's house on April 27, 1871, at about 2:30 P. M. The respondent contended that between 8:30 and 11 that morning, Elvira Woodward was under an immediate sense of impending death, and that while in that condition she stated the cause of her illness. Upon this point Daniel K. White testified for the respondent, upon direct examination, in substance as follows: " I knew Elvira Woodward; saw her at Dr. Wood's house the morning of the day she died; found very large gash in her throat; Dr. Wood stepped to the bed and removed a towel from her throat. I saw Dr. Ferguson there; Dr. Wood went for him about ten minutes after I got there; she looked pale, quite so; apparently recognized me by a nod of the head; I observed nothing else, except that her throat was cut, and there was a good deal of blood upon her bed-clothes; she said she did not expect to live till noon; that she was sorry she didn't do the deed at once, and go where her mother was; that she would be glad to die; that she didn't expect to live till noon, and probably shouldn't."

Upon cross-examination, White testified: " There was nobody present but me when she said this; Dr. Wood was gone after Dr. Ferguson; Dr. Wood had come to my office and asked me to go up to his house, and take a sheet of paper with me; he did not say what he wanted; I heard Elvira say, in Dr. Ferguson's presence, about the same as she did to me; Dr. Ferguson told her that she probably would not live long."

The respondent also put in the deposition of Florence Woodward (which is hereby made part of this statement).

Florence Woodward, in said deposition, testified, among other things,

that she saw her sister Elvira twice on the day she died,—first, between ten and eleven o'clock in the forenoon, and again between two and three o'clock in the afternoon ; that at the latter time Elvira was dying; and that she never saw Elvira at Dr. Wood's house before that day.

*Int. 4.* What was her condition when you saw her in the forenoon of that day ? *Answer*—She was very low. *Int. 5.* State whether or not she was then in a condition to have conversation with you, and whether you did converse with her then. *Answer*—I don't think she was. I held no conversation with her then. *Cross Int. 42.* Did you understand your sister was in a dying condition when you first visited her at Dr. Wood's house, and did she so understand at that time ? *Answer*—I did not; I thought she would live a few days; I don't know what she thought about it ; I heard her say nothing about it ; I heard nothing said to her by any one about her being in a dangerous condition. *Cross Int. 44.* From the appearance of your sister at your first visit to her at Dr. Wood's house, should you judge her to be able to converse upon any subject? *Answer*—I should hardly think she was capable of conversing. *Cross Int. 45.* When did you next see her ? *Answer*—Between two and three o'clock of the afternoon of the same day. *Cross Int. 46.* Was she conscious or not at that time ? *Answer*—Unconscious. *Cross Int. 14.* Whom did you find at Dr. Wood's on your arrival there (referring to the first visit)? *Answer*—Remember no one but Dr. Wood and his wife ; Mrs. Eaton went with me there. *Cross Int. 15.* Did you go directly to your sister's room, and how long did you remain there at that time ? *Answer*—I did, and think I remained there nearly an hour, but am not certain. *Cross Int. 16.* Was any person except Dr. Wood, his wife, and Mrs. Eaton, in your sister's room while you were there; if so, who ? *Answer*—If I recollect correctly, a gentleman passed into my sister's room as I passed out, and I think they said it was Dr. Ferguson ; I saw no one else there. *Cross Int. 17.* Did your sister appear wandering the first time you called to see her on that day ? *Answer*—I could not say she did ; she made no conversation. *Cross Int. 18.* Did she recognize parties or persons about her ? *Answer*—Yes ; she seemed to recognize me. *Cross Int. 19.* Did she seem to recognize others ? *Answer*—Yes ; I thought she did. *Cross Int. 20.* Did you speak to her, or did any one ask her questions while you were there ? *Answer*—I spoke to her ; I don't recollect that any one asked her any questions. *Cross Int. 21.* What did you say to her ? *Answer*—I don't remember, but think I said to her " You have been very sick," or something of that kind. *Cross Int. 22.* Did you speak to her more than once ? *Answer*—I don't remember. *Cross Int. 23.* Did she reply to your address ? *Answer*—I think she said " Yes," but am not certain. *Cross Int. 24.* Was she very pale and apparently greatly exhausted ? *Answer*—She was, if I remember rightly.

Florence Woodward also testified that she did not know until after Elvira's death that her sister died from any cause except fever.

Having offered no other testimony than that of White and Florence

Woodward, the respondent moved to be allowed to ask what Elvira Woodward said that morning as to the cause of her condition. The court intimated that, as it appeared there were other persons who saw her that morning, the respondent might find it for his interest to put in the testimony of same one or more of those persons. Thereupon the respondent called Dr. Ferguson, who testified substantially as follows : " I was called by Dr. Wood to his house on the morning of April 27. Found there a young woman, looking very pale, worn, emaciated, and desponding. I removed cloth, and found flesh wound across the throat. I asked her why she had attempted to hasten death by suicide. Told her that her condition was so low already that a few hours would extinguish life. I said to others in her presence and hearing that she would possibly die in the morning, or in the early part of the afternoon. She said she did not much care ; that she had no desire to live." Upon cross-examination, Dr. Ferguson testified: " The cut on the throat was superficial ; it did not cut the muscles, and was not at all dangerous ; I did not think she would live through the day. Dr. Wood desired me to sew up the throat wound, and I did so, first going to my office to get silver wire for that purpose. Dr. Wood, when he came for me, said that a lady in his house had wounded herself dangerously, and that he wanted me to go and sew up the wound. The young woman was constantly vomiting ; presume I said, before the grand jury, that I told her that if she didn't use stimulants she would not live through the day ; I suppose I also said, before the grand jury, that I then turned to Dr. Wood, and said in an undertone, which the girl did not hear, that she would not live through the day. If I said so, I did not intend the expression should shock her."

The state then called the foreman of the grand jury which found the indictment. Subject to exception, he was permitted to testify substantially as follows : " I think that Dr. Ferguson, in his testimony before the grand jury, said that he found the girl in a sinking condition ; that he examined her and felt of her pulse ; that he told her that she would have to stimulate to live through the day, or to keep up through the day ; that he then turned to Dr. Wood and said to him that she wouldn't live through the day ; that Dr. Ferguson said he spoke it to Dr. Wood in a low tone so that the girl wouldn't hear it." White and Ferguson, upon further cross-examination, stated the locality of their offices, being a quarter of a mile or more from Dr. Wood's house.

After the above testimony, counsel for the state argued to the court, in the presence of the jury, against the admissibility of the alleged dying declarations, contending that the testimony of White and Ferguson as to the girl's condition, and her sense of her condition, was false, and was given in pursuance of a scheme which was termed " a put up job." The respondent objected, during this argument, that it was not proper, but the counsel for the state were permitted to proceed. At the conclusion of the argument for the state, the court ruled that the respondent might put in Elvira Woodward's declarations, made that morning, as to the cause of her condition. After

verdict, the respondent excepted to the refusal of the court to check the counsel for the state in the above argument.

The respondent's witnesses testified that Elvira Woodward, on the morning of the day of her death, stated that she had been delivered of a *fœtus* April 3; that she had been operated upon by Dr. McCoombs, to produce an abortion, four times at the Manchester House, and once at Suncook; and that she had taken oil of savin, prescribed by Dr. McCoombs.

Mrs. Merrill testified, that on February 8 she accompanied Elvira Woodward to Dr. McCoombs's rooms at the Manchester House; that Elvira was for about an hour with the doctor in the inner room; that she herself was in the inner room only a few minutes. She described what she saw while in the inner room, and from that description the jury might have found that Dr. McCoombs was then performing an operation on Elvira to produce abortion. The respondent proposed to show the statements made by Elvira to Mrs. Merrill, immediately on leaving the Manchester House, as to what had been done to her by Dr. McCoombs; but it was excluded, subject to exception. It was also ruled, subject to exception, that the respondent could not ask Mrs. Merrill (with whom Elvira boarded, in February and March) the following question: "Did Elvira ever tell you where she was going, and for what purpose?"

Joseph Ferrin testified, that on March 29 he loaned a shawl to Elvira. The respondent proposed to prove that, when Elvira borrowed the shawl, she said that she was going to Lowell, and that when she returned the shawl she said she had been to Lowell and accomplished her purpose; and that she said she had had an operation performed upon herself. The evidence was excluded, subject to exception.

Dr. Ferguson was examined by the respondent as an expert. He testified that he had had no personal knowledge of the effects of oil of savin; that what he knew on the subject was derived from his reading. He then testified that savin has partially the reputation of having a specific effect on the *uterus* to produce abortion; and that he presumed a constant use of savin for some time would produce the effect he saw when he visited the girl. During his direct examination he had several books upon the table near him, and was apparently about to read from one of them, when he was prevented by the objection of the state. Upon cross-examination, counsel for the state proposed several questions similar in form to the following: Have you found, in the course of your reading or study, this sentiment in regard to oil of savin (then reading from a sheet of writing paper in his hand): "Death in an hour after taking it"? Have you also found this: "A woman took one hundred drops of oil of savin every morning for twenty days, and went full time"? or this: "Good in torpid condition of the womb"? or this: "Almost fatal consequences in producing abortion"? or this: "Its properties to produce abortion have been denied by late authors, of weight and reputation"? or this: "Has no action as an abortive except like other irritants"? The

respondent objected that; if he could not be permitted to put in the books themselves, such questions were inadmissible; but the state were allowed to put the questions, subject to exception, and the witness answered several of them in the affirmative. Subsequently, upon re-direct examination, the respondent asked several questions similar in form to the above, as to the existence in the books of statements tending to confirm the. testimony of the witness on his direct examination.

The jury were instructed that the state must prove the abortion to have been produced by the use of an instrument; and that proof that it was produced by drugs would not sustain the indictment. After verdict, the respondent took the exception, that there was no evidence submitted to the jury on which they could found the fact that any instrument was used. The evidence for the state on this point was in substance as follows: Dr. Webb, of Boston, Mass., testified, that at the request of a lawyer he examined Elvira Woodward, March 20, 1871, to see if she was pregnant; that he found her womb enlarged; that he got a distinct motion of some substance in the womb; that he had no doubt it was a *fœtus ;* that, by applying his ear to the abdomen, he got a distinct pulsation of the fœtal heart; and that, in his opinion, she was then four or five months advanced in pregnancy. It was admitted by the respondent that Elvira came to his house April 1, and remained there till her death, on April 27; that she was delivered of a dead *fœtus* April 3; and that she died of puerperal fever. Dr. Buck testified that he made a *post-mortem* examination of her body, at North Troy, Vermont, on May 2; that he found no *fœtus* in the womb, but that from what he saw (which he fully detailed) he thought she had been pregnant and had been delivered by artificial means. He described the different modes of procuring abortions, all of them being by the use of instruments (provided the use of a syringe to inject water into the womb can be so considered). He further testified: I know of but one drug that acts directly on the womb, causing contraction, and I don't believe that would act unless contraction had already commenced. Any irritant poison taken to destroy the mother may or may not produce abortion. I saw no indication of irritant poison in the stomach or kidneys of this girl. I think savin always leaves its mark on the stomach. I should not expect to find marks from any instruments, if skilfully used. Dr. Gilman Kimball testified: I don't believe there is any drug in the world that will have the slightest effect on the *uterus* in bringing about abortion, with this qualification, that ergot will have an effect if given after contraction has begun, and possibly might have some effect if given while the womb was just ready to contract. If oil of savin had been taken to any great extent, I should expect, at *post-mortem,* to find effect on stomach and kidneys. Dr. Kimball described the different modes of procuring abortion in substantially the same manner as Dr. Buck.

The respondent testified that he did not in any manner produce the abortion. (There was a good deal of conflicting testimony as to

whether the respondent produced the abortion ; but in the foregoing it has been intended to state only the evidence which the state might claim tended to show that it was produced by the use of an instrument.)

The respondent, having been convicted, moved in arrest of judgment, because there was no allegation in the indictment that the act charged was not necessary, by reason of some mal-formation, or of difficult or protracted labor, to preserve the life of the deceased, or was not advised by two physicians to be necessary for such purpose. He also moved to set aside the verdict, by reason of the foregoing exceptions.

The motions were both denied.

The jury was impannelled on Tuesday morning; the evidence was closed on Friday evening; the case was given to the jury Saturday afternoon, and the verdict was returned that evening, in the absence of the counsel for the respondent. On Monday, the respondent's counsel gave notice of a motion for a new trial on account of partiality or misconduct of jurymen, this being the first intimation given by them, to the court of the existence of any objection of that nature. The court appointed Tuesday morning for the hearing of testimony, and sent for all the jurymen in any way implicated. Upon Tuesday morning there was a hearing relative to four jurymen,—Messrs. Ober, Howe, Kidder, and Titus.

Mr. Ober was sworn as a witness, and examined. He testified that he had heard, before the trial, a report that the respondent once had an office or lying-in hospital in Hollis, where abortions were produced ; that he had heard nothing of the present case, except reading in the newspapers of the respondent's arrest ; that he was not prejudiced or biased, but stood impartial relative to the same.

As to Mr. Howe, the respondent offered the affidavit of Ai Colburn. The state objected, that Colburn should be put on the stand, his place of business being within a few rods of the court-room. The court said the affidavit might be read, and that the omission to put the affiant on the stand might be commented on. The following affidavit was then read :

I, Ai Colburn, of Nashua, N. H., depose and say, that, on Saturday morning last, a large fleshy man, full face, of a sandy complexion, with full sandy beard, that I did not then know, but have since been informed that his name was Howe, of Manchester, came into my store before the court went in, and I had some talk with him in regard to the case of *State* v. *Wood*, then on trial. I think he commenced the conversation. I think there was another person there, but I cannot now tell who it was. After he spoke of the case, I spoke of the witness called by the defence, who was a dressmaker. I happened to be in court when she testified. I remarked that her testimony was straightforward,—and he replied, It was, for made-up testimony ; and then he referred to McCoombs, and said we had considerable fun on that, and began to tell me what it was, and then said,—"I guess it won't do for me to tell." I then asked if he was one of the jurymen ;

he said, Yes. I then said nothing more to him about the case. I had no knowledge whatever that he was one of the jurors in that case until he told me that he was.                                    AI COLBURN.
HILLSBOROUGH SS., October 2, 1871.
    Subscribed and sworn to before me,                C. W. STANLEY,
*Justice of the Peace.*

Mr. Howe was then sworn and examined, first by the court, then by the respondent's counsel. He testified that he had no recollection of being in Colburn's store on Saturday morning; and that he was very sure that he never made any such statement as Colburn swore to, nor anything like that.

Ai Colburn was then called by the respondent, and testified that he wouldn't swear positively that Mr. Howe was the man referred to in his affidavit, but that he thought Howe was the man.

As to Mr. Kidder, the respondent put in the following affidavit:

I, Lewis W. Clark, depose and say, that I was one of the counsel for the respondent in the case of *State* v. *Wood;* that, on Saturday morning last, before the coming in of the court, a gentleman standing at the right of the clerk's desk, whom I did not at the time recognize as being one of the jury engaged in that trial, spoke to me and said he wanted to see me a moment. I went to him, and we sat down on a settee, and he said he wished to inquire of me in regard to the right of two individuals to vote in his town. He stated the facts to me, and while in conversation on that subject, Mr. James Scott, foreman of the grand jury, came up to us, and made this remark: "You had some fun in court when Dr. McCoombs was on the stand." I replied, in substance,—"Yes; we have more or less fun in all cases." At that time it occurred to me that the gentleman with whom I was conversing might be one of the jury, and, on looking at him, I thought he was. Immediately on my making the remark which I have stated, Mr. Scott said,—"That fellow told the truth; he don't know enough to procure an abortion, and had no more to do with this one than I had." I touched him on the arm: Mr. Ramsdell took hold of him, and the juryman left without making any remark. Immediately after the juror left, Scott says,—"Was that a juryman?" I said, Yes. He said,— "That's just my luck; I did not know it." I have since learned that the juror was Phineas C. Kidder, of Francestown.
                                             LEWIS W. CLARK.
HILLSBOROUGH SS., October 2, 1871.
    Subscribed and sworn to before me,                C. W. STANLEY,
*Justice of the Peace.*

Mr. Clark was then sworn, and examined by the state, his testimony being substantially as in his affidavit. It was expressly admitted by the respondent's counsel, that Mr. Scott did not know that Mr. Kidder was a juryman.

Mr. Kidder was then sworn and examined. He testified, substantially, as follows: "I didn't notice who the gentleman was; should

think he said that he guessed that McCoombs told the truth. I didn't notice much what he did say; I didn't take notice enough to look to see who he was; I don't think the remark had any influence on my mind in reference to the case; I didn't think of it again till I was told of it this morning, so far as I know."

As to Mr. Titus, Edward P. Coggswell, of Manchester, testified, substantially, as follows: "I was at the police court hearing, on Dr. Wood's case, last May. At about that time—I think that same day— I saw Mr. Titus on the sidewalk near the city hall. I said I thought it was too bad about Dr. Wood's trouble; that I didn't think him guilty. Mr. Titus said he didn't know; he thought he was guilty."

Upon cross-examination, Coggswell testified,—"I think this talk was after the first hearing in the police court; my wife testified for the respondent upon the trial here last week; I saw a list of the jurors in this case published in the newspaper last week—I think on Wednesday; I first mentioned the remark of Mr. Titus last night; my wife and I were at the Manchester depot on the arrival of the up-train, Saturday night, to hear about the trial; my wife was down here, yesterday, to see how the trial was getting along; she told me upon her return that they were trying to get a new trial, but didn't say on what grounds; I didn't think of Mr. Titus's remark till I saw Mr. Lewis W. Clark in his office last night; I had thought of it before, but had never spoken to anybody about it. [Re-direct:] Mr. Clark, I think, asked me last night if I knew the two Manchester jurymen."

It appeared, by Mrs. Coggswell's testimony at the trial, that she was a friend of Dr. Wood's, and a frequent visitor at his house.

Mr. Titus was then sworn, and examined by the court. He testified,—"I don't recollect having any conversation with Coggswell, nor meeting him on the sidewalk upon the day specified; I have no recollection of ever mentioning anything of the kind to him; my impressions are, that I never mentioned it to him in the world; I have no recollection of any such talk at the time the jury were impannelled." In answer to the respondent's counsel, he testified,—"I know Mr. Coggswell, and sometimes meet him; I think I am sure I never made any remark about Dr. Wood to anybody; had heard Dr. Wood talked about before this charge; had heard common report round about this charge; I attempted to throw aside everything I ever heard; guess I succeeded pretty well."

The court denied the respondent's motion for a new trial, and the respondent excepted.

The respondent, having been sentenced to twelve years' imprisonment, tendered this bill of exceptions, which was allowed by the court.

SARGENT, C. J. This indictment is founded upon section 13 of chapter 264, General Statutes, and provides that any person who shall cause the death of any pregnant woman, in the manner therein described, shall be taken and deemed to be guilty of murder in the second degree, and be punished accordingly. Section 5, of the same

chapter, provides that the punishment of murder in the second degree shall be imprisonment from ten to thirty years; and section 1, chapter 243, provides that " any person indicted for any offence, the punish- ment of which may be death, shall be entitled to a    *    * list of the witnesses to be used on the trial," etc. ; and section 8 provides that any person, arraigned and put on trial for any offence which may be punished with death    *    * may, in addition to challenges for cause, peremptorily challenge twenty    *    * of the jurors. It is only when on trial for some offence the punishment whereof may be death, that the respondent is entitled to these privileges. Murder in the second degree is not so punishable ; therefore a person charged with and tried for murder in the second degree is not so entitled. This respondent, if convicted of the offence charged, is to be taken and deemed to be guilty of murder in the second degree, and punished ac- cordingly, not with death, but by imprisonment from ten to thirty years, and was not entitled to be furnished with a list of the state's witnesses, nor was he entitled to his twenty peremptory challenges. This exception is overruled.

The calling the foreman of the grand jury to testify what the evi- dence was before that jury, we think was also justified by the authori- ties.    In 1 Ch. Cr. Law, sec. 317, it is said that the true object of the secrecy required of the grand jury is, to prevent the evidence produced before the grand jury from being counteracted by subornation of per- jury on the part of the defendant ; and that, when a witness upon the trial swears differently from what he did before the grand jury, they (the grand jurors) may inform the judge, who may cause the witness to be prosecuted for perjury on the testimony of the grand inquest.    See also 4 Bach. Com. 126, and note by Christian ; 2 Russell on Crimes 912.    In *Tompson* v. *Mussey*, 3 Greenl. 305, it was proved what the testimony was before the grand jury, but it is not clear whether by the prosecuting officer alone ·or by the aid of the jurors.    But in *Low's case*, 4 Greenl. 439, the testimony of the grand jurors was received, not so much to show what the testimony was, as to show that twelve of the jurors did not concur in finding the bill of indictment.    And it was held, contrary to the general holding on that subject, that a case for the defendant might be made out in that way,—which was going much further than the present case.    In 1 Wharton's Am. Cr. Law (6th ed.), sec. 508, this matter is discussed, and the authorities cited and com- mented on, from which I judge the weight of authority now to be, that a grand juror may be compelled to testify—when necessary to promote the cause of justice—what the witnesses before the grand jury testified to, either to contradict such witnesses, or otherwise.

In *Commonwealth* v. *Mead*, 12 Gray 167, the question arose in its present form, whether the testimony of grand jurors is admissible to prove that one of the witnesses in behalf of the prosecution testified differently before them from the testimony before the trial jury.    In the opinion, BIGELOW, J., says,—As to the competency of such evi- dence, the authorities are not uniform : the weight of it is in favor of its

admissibility : on principle, it seems to us to be competent. He then states the grounds of his opinion, which seem to us quite satisfactory and sufficient. Such is the opinion of Mr. Bishop, as expressed upon a review and examination of the authorities on that subject. 1 Bish. Criminal Procedure (1st ed.), sec. 730. I think the practice in this state has been the same way. We think this exception must be. overruled.

As to the arguments upon one side and the other, in regard to the admissibility of the dying declarations of said Elvira Woodward, it does not seem to us that the objection is well founded. When counsel argue upon facts not in the case, they should be stopped when the court's attention is called to it; but they usually argue the evidence which is in, or which is offered, and express their views of it and of its competency freely and fully. The evidence was offered and its materiality was discussed, and counsel expressed their views of it fully. The evidence was finally ruled in, and the jury had the evidence, with the views of counsel thereon, in the beginning, instead of hearing the evidence first, and the arguments as to its weight afterwards. We can see no good grounds for this objection.

The next three exceptions stand upon the same ground, and may all be considered together. The evidence offered was the merest hearsay in the world. They were not dying declarations, nor were they connected with any fact that alone had any connection with the cause on trial. The case of *Patten* v. *Ferguson & a.*, 18 N. H. 528, would seem to settle this question. The fact was of no importance, standing alone, and the declaration, standing alone, was incompetent: when they are united, the unimportant fact is used as a vehicle to introduce the incompetent declaration. *Downs* v. *Lyman*, 3 N. H. 486 ; *Morrill* v. *Foster*, 32 N. H. 358. The calling at Dr. McCoombs's on February 8 with Mrs. Merrill, and what Elvira said on leaving the Manchester House on that occasion, and that she ever told Mrs. Merrill where she was going and for what purpose, or the fact that Ferren lent her a shawl on one occasion, and that she told him where she was going, and when she returned it that she told where she had been and what she had done,—are all facts of no importance here, when standing alone, and the declarations, standing alone, were clearly incompetent ; and the theory that such a declaration can be valid and made competent by connecting it with a fact utterly immaterial to the cause, does not need authorities to refute it.

As to Dr. Ferguson's cross-examination, we see no reason for any objection to it. He had stated, as well he might, on direct examination, his knowledge of a particular subject, not from any experience or actual observation, but from what he had derived merely from reading and studying medical authorities. Then he was cross-examined as to that general reading, not by putting in the books, but by inquiries whether, in his general reading, he had not found particular theories laid down conflicting with the theory he had advanced as the result of his reading. *Collier* v. *Simpson*, 5 Car. & Payne 73, goes further than the present

case. There TINDAL, C. J., in speaking of a medical expert, says,—" I think you may ask the witness whether in the course of his reading he has found this laid down." And that was upon direct examination. The chief justice further says,—" I do not think that the books themselves can be read, but I do not see any objection to your asking Sir Henry Halford [the witness who was the president of the College of Physicians] his judgment and the grounds of it, which may be in some degree founded on books, as a part of his general knowledge ; "—and see 1 Wharton Am. Cr. Law (6th ed.), sec. 50.

It is settled, in *Taylor* v. *Railway*, 48 N. H. 304, that a physician may give his opinion as an expert upon a subject concerning which he has had no practical experience, and where his knowledge is derived from study alone. This case, we think, fully sanctions the direct examination of this witness upon a subject where his knowledge was derived from books alone ; and the cross-examination was simply the testing of the correctness of his opinion by the same standard upon which the opinion was founded,—the authority of the medical books which he had read. We think this ruling was right.

As to the exception that there was no evidence submitted to the jury upon which they could find the fact that any instrument was used, we can have no doubt. Deceased was shown to have been, on March 20, 1871, pregnant with a quick child, being some four or five months along. It was admitted that she came to the defendant's house the first day of April after, where she remained, and that she was delivered of a dead *fœtus* April 3, after which she had puerperal fever, of which she died April 27.

The testimony of Dr. Buck tended to show that she had been pregnant while she was alive, and that she had been delivered by some artificial means ; that she had not taken any kind of poisons to produce this result, for the reason that, if taken, they would leave their marks in the stomach and other parts of the body, and that he found no such marks here. He found no marks of instruments, but he described the manner of using them in procuring abortions, and testified that, if skilfully used, he should not expect they would leave any marks. His opinion was, in brief, then, that an abortion had been produced by artificial means, and he was satisfied it was not by poisons or drugs taken into the stomach, but that it was done by the use of instruments which would be expected to leave no marks ; which was the case in this instance. We think the evidence was competent, so that the jury may have properly found that the respondent produced an abortion with " a certain instrument to the jurors unknown."

The next exception, that to the form of the indictment, has no foundation, as will be seen by an examination of the indictment, and comparing it with secs. 11, 12, and 13, ch. 264, Gen. Stats. This indictment is founded upon secs. 11 and 13 of this statute, and not upon secs. 12 and 13 ; and therefore no such allegations in the indictment were called for as the defendant suggests.

We are also satisfied that there is no good reason to set aside the

verdict on the ground of misconduct on the part of the jurors, and that the motion for a new trial was properly denied.

*Exceptions overruled.*