JONES v BLOOM

Opinion of the Court

1. Evidence—Witnesses—Expert Witnesses—Cross-Examination—Textbooks—Hearsay.

Testimony of expert witnesses is in all probability far less reliable than testimony derived from textbooks; the fact that the textbooks used on cross-examination of an expert witness would contain hearsay material is not a sufficient justification to prevent this type of cross-examination in view of the countervailing arguments in favor of admissibility.

2. Evidence—Witnesses—Expert Witnesses—Cross-Examination—Textbooks.

In cross-examining an expert witness, if an attempt is made to use an outdated textbook, the expert will refuse to recognize it as authority; if a new discovery has occurred since the publication of the textbook, the expert has the opportunity to explain this to the jury.

3. Evidence—Witnesses—Expert Witnesses—Cross-Examination—Textbooks.

Cross-examination of an expert witness, by the use of textbooks, will not confuse a jury by technical passages and they will not be used unfairly by taking passages which are explained away or contradicted in other parts of the book because opposing counsel may either ask questions of his client to explain the meaning of technical passages, or point out that the text is inaccurate, or, he may call other experts to take the stand to explain the technical passages.

4. Evidence—Witnesses—Expert Witnesses—Cross-Examination—Textbooks—Malpractice.

The practical difficulty in obtaining experts to testify in malpractice cases militates in favor of the use of textbooks in the cross-examination of expert witnesses.

References for Points in Headnotes
[1–4, 6–8] 29 Am Jur 2d, Evidence §§ 887–890.
[5] 29 Am Jur 2d, Evidence §§ 16, 17, 25, 117.

5. EVIDENCE—WITNESSES—EXPERT WITNESSES—CROSS-EXAMINATION—
TEXTBOOKS—JUDICIAL NOTICE.

Medical textbooks or other publications may be used to cross-
examine expert witnesses if the expert recognizes the publica-
tion as authoritative, or if the trial court takes judicial notice
of the publication as authoritative; great caution must be
exercised by the trial court to ascertain that the authority cited
is pertinent to the subject matter under consideration and
passages which are irrelevant are not admitted into evidence.

6. EVIDENCE—WITNESSES—EXPERT WITNESSES—CROSS-EXAMINATION—
TEXTBOOKS.

Excluding plaintiff's cross-examination of defendants' expert wit-
ness by the use of authoritative medical textbooks was error.

DISSENTING OPINION

BLACK, J.

7. EVIDENCE—WITNESSES—EXPERT WITNESSES—TEXTBOOKS—CONTRA-
DICTING WITNESS.

*A medical witness must first refer to a textbook as his authority
before it may be used to contradict him.*

8. EVIDENCE—WITNESSES—EXPERT WITNESSES—CROSS-EXAMINATION—
TEXTBOOKS.

*Trial court properly required an admission from a medical wit-
ness that he relied on a certain textbook in the formulation of
the opinions expressed in court as being the only basis upon
which such a medical witness could be cross-examined by the
use of that book.*

Appeal from Wayne, Charles Kaufman, J., and
from Court of Appeals prior to decision. Submitted
June 10, 1971. (No. 11 June Term 1971, Docket
No. 52,922.) Decided August 30, 1972.

Complaint by Jennifer Jones by her next friend
Hazel O'Banner against Herbert Bloom and Myron
Kaufman, individually and as partners as Bloom
Associates for damages resulting from the alleged
malpractice and negligence of defendants. Judg-
ment for defendants of no cause of action. Plaintiff
appealed to the Court of Appeals and applied to

the Supreme Court for leave to appeal prior to decision by the Court of Appeals. Leave granted. Reversed and remanded for new trial.

*Balfour Peisner,* for plaintiff.

*Matheny, Schureman & Frakes,* for defendants.

Swainson, J. On March 27, 1964, Jennifer Jones, aged ten, was taken by her mother, Hazel O'Banner, to see Dr. George Logwood, the family dentist. Dr. Logwood informed Mrs. O'Banner that Jennifer needed oral surgery and referred her to defendants' clinic. On Saturday, March 28, 1964, Mrs. O'Banner and Jennifer went to defendants' clinic between 8:00 and 8:30 a.m. They were asked by the receptionist if they had an appointment and they replied that they did not. The receptionist informed them that the clinic was quite busy and that they would not be able to take Jennifer until after lunch. Mrs. O'Banner was then given a white piece of paper to fill out, which she did. She returned the paper to the receptionist.

Plaintiff and her mother then went to a friend's house in the neighborhood, where they remained until approximately 11:15 a.m. Jennifer said she was hungry, and they stopped at a restaurant about a block from the clinic where Jennifer had a hamburger, a coke, and custard cream pie. They finished eating about 12:45 p.m., and walked back to the clinic. Jennifer was called by the receptionist at approximately 1:50 p.m. Mrs. O'Banner testified that when Jennifer was taken from the reception room to the room where the extractions were to be performed, she was crying and shaking and very agitated. She testified that Jennifer was not given any examination and that neither her blood

pressure nor her temperature was taken. The only question the doctor asked upon first seeing Jennifer was why she was crying.

An injection of methol hexitol was administered by Dr. Attenson, in order to induce general anesthesia. Two teeth were removed by Dr. Attenson, which took one and one-half to two minutes. After the extractions, Jennifer suffered a cardiac arrest and stopped breathing. Resuscitative measures were instituted immediately and plaintiff's heart was started again. It was not until evening that Jennifer was transferred to Sinai Hospital by ambulance. She remained in a coma for ten weeks. Jennifer suffered permanent brain damage, impaired functioning of her arms and legs, body tremors, and a speech defect. Defendants do not dispute the fact that Jennifer sustained extensive damage.

Plaintiff's complaint, filed on February 27, 1969, alleged malpractice on the part of defendants in administering to plaintiff a general anesthetic after she had ingested a meal and, alternatively, that no premedication was administered prior to the anesthetic, which caused plaintiff to remain over-excited and induced her to go into shock brought on by the general anesthetic.

At the trial, plaintiff's attorney attempted to cross-examine Dr. Attenson by reading excerpts from textbooks which Dr. Attenson testified he recognized as authoritative. It is conceded that Dr. Attenson had not relied upon these textbooks as authority for answers to previous questions, and the trial court, relying on previous Michigan Supreme Court decisions, refused to permit such cross-examination. The jury returned a verdict of no cause of action. In view of the importance of the issue involved, we granted leave to appeal

prior to decision by the Court of Appeals. 384 Mich 760.

Plaintiff lists 13 issues on appeal. The key issue is whether the trial court committed reversible error in refusing to allow plaintiff's counsel the right to use standard medical textbooks in cross-examining an expert witness when the expert witness recognized the textbooks as authoritative? The other issues, which will be considered together, concern whether the trial court made prejudicial rulings so as to unfairly prejudice plaintiff and to require a new trial?

## I.

## THE MICHIGAN RULE

The first Michigan case dealing with this issue of reading textbooks to the jury was *People v Hall,* 48 Mich 482, 490–491 (1882). Defendant Hall had been tried and convicted of murder. On appeal, the Supreme Court reversed. The Court held that it was improper to read medical books to the jury. Justice CAMPBELL, speaking for the Court, stated:

"We observe that resort was had to reading medical books to the jury, the record not showing, however, what matters were thus laid before them. If this was anything it was evidence, and probably evidence which was used with some effect. The practice is not permissible. Scientific or expert testimony must be given by living witnesses who can be cross-examined concerning their means of knowledge and can explain in language open to general comprehension what is necessary for the jury to know. * * * The cases must be very rare in which any but an educated physician could understand detached passages at all, or know how much credit was due to either the author in general or to particular parts of his book. If jurors could be safely trusted with the interpretation of such books, it is hard to see on

what principal living witnesses would be required. Scientific men are supposed to be able from their study and experience to give the general results accepted by the scientific world, and the extent of their knowledge is tested by their personal examination. But the continued changes of view brought about by new discoveries in most matters of science, and the necessary assumption by scientific writers of some technical knowledge in their readers, render the use of such works before juries —especially in detached portions and selected passages —not only misleading but dangerous. The weight of authority as well as of reason is against their reception."

Thus was stated the rule that medical textbooks could not be read to a jury as direct evidence. The rule was at that time accepted by all states except Alabama.[1] However, the reasoning used in *Hall,* which concerned reading extracts to the jury on direct examination, was applied in later cases to varying fact situations.

The next Michigan case to deal with this issue was *Pinney v Cahill,* 48 Mich 584 (1882). This has long been cited as one of the leading cases on the subject. Cahill had hired plaintiff's horse and the animal became sick and died. Plaintiff filed suit for damages. The Supreme Court affirmed the jury's verdict in favor of defendant. Plaintiff's expert witness, a veterinary surgeon, stated that colic (from which the horse died) was caused by overdriving and feeding when the animal was too warm; that all works of good authority spoke of it, and that *Modern Horse Doctor* was a work of that kind. Defendant, over plaintiff's objection, introduced a statement from the book tending to discredit plaintiff's expert's statement. The trial court held that this was not error. The Supreme Court stated (pp 586–587):

---

[1] *Stoudenmeier v Williamson,* 29 Ala 558 (1857).

"The rule is acknowledged in this State that medical books are not admissible as a substantive medium of proof of the facts they set forth. But the matter in question was not adduced with any such view. The witness assumed to be a person versed in veterinary science; to be familiar with the best books which treat of it and among others with the work of Dodd. He professed himself qualified to give an opinion to the jury from the witness stand on the ailment of the plaintiff's horse and its cause, and the drift of his opinion was to connect the defendant with that ailment. He borrowed credit for the accuracy of his statement by referring his learning to the books before mentioned and by implying that he echoed the standard authorities like Dodd. Under the circumstances it was not improper to resort to the book, not to prove the facts it contained, but to disprove the statement of the witness and enable the jury to see that the book did not contain what he had ascribed to it. The final purpose was to disparage the opinion of the witness and hinder the jury from being imposed upon by a false light. The case is a clear exception to the rule which forbids the reading of books of inductive science as affirmative evidence of the facts treated of. *Ripon v Bittel,* 30 Wis 614 (1872); 2 Whart. Ev. § 666."

Two factors of this decision are significant: First, the Court stated, "The final purpose was to disparage the opinion of the witness and hinder the jury from being imposed upon by a false light." Thus, the Court recognized that the attempt to discredit the witness was a legitimate purpose in the use of textbooks. Second, the Court said: "The case is a clear exception to the rule which forbids the reading of books of inductive science as affirmative evidence of the facts treated of." By stating that this was "a clear exception," the Court recognized that there could be other exceptions to the rule.

In *Marshall v Brown,* 50 Mich 148 (1883), plaintiff had sued defendant, a druggist, for negligence in giving her sulphate of zinc instead of Epsom

salts. She recovered at her first trial and the
Supreme Court reversed. On retrial, she again
recovered a verdict, and the Supreme Court again
reversed. The Court stated (p 150):

"One error occurred, however, which it is impossible
to overlook. It was decided in *People v Hall,* 48 Mich
486 (1882), that it was not competent to read profes-
sional books to the jury as evidence. The decision had
not been made when this case was tried the second
time; if it had been the error now complained of would,
probably, not have been committed.

"On the cross-examination of Dr. Wood, a witness for
the defendant, he was asked if he was acquainted with
a certain book. He replied that he had heard of it but
had not read it. He was then asked whether it was
considered good authority, and he said it was. He was
then requested to read a certain paragraph during the
recess of the court. When the court convened again, he
was recalled and counsel reading from the book the
paragraph to which his attention had been called, asked
him whether there was a case reported of taking sulp-
hate of zinc, followed by vomiting, purging, and death?
As this was what the paragraph stated, the evident
purpose of the question was to put the passage from the
book in this indirect manner before the jury, instead of
reading from it directly. The witness demurred to this
method of examination, but was required to answer and
did so.

"The case differs from *Pinney v. Cahill,* 48 Mich 584
(1882), where a medical book was produced to contra-
dict a witness who professed to be testifying from it."

The Court thus extended the doctrine of *People
v Hall* which dealt with substantive evidence on
direct examination to cases involving cross-exami-
nation without any discussion as to whether the
reasoning should apply in such situation.

The next case dealing with this issue was *People
v Millard,* 53 Mich 63 (1884). The Court, in exclud-
ing excerpts from medical books, pointed out that

these excerpts were introduced on direct examination as well as on cross-examination. Thus, to the extent that the excerpts were introduced on direct examination, the Court properly followed the rule laid down in *People v Hall.* However, it could not be precedent for the view that medical excerpts could not be introduced on cross-examination to test the knowledge of witnesses. A close reading of *People v Millard* primarily indicates the Court's concern that textbooks which were not really authoritative on the subject would be introduced in evidence.

In *People v Vanderhoof,* 71 Mich 158, 179–180 (1888), the Court, in following the rule laid down in earlier cases, recognized the unfair burden that it placed upon the party opposed to the experts, by stating:

"We do not find any error in the rulings as to medical books. The court seems to have followed as consistently as possible the rulings of this Court. See *Pinney v. Cahill,* 48 Mich. 584 (12 N.W. Rep. 862) [1882]; *Marshall v. Brown,* 50 Id. 148 (15 N.W. Rep. 55) [1883]; *People v. Millard,* 53 Id. 77 (18 N.W. Rep. 562) [1884].

"The expert has, or may take, perhaps, advantage of his position, under these authorities, and state that his opinion is derived from standard works; and if he fails to remember what particular books he has read, or what particular books he has culled his authority from, there is, under the previous decisions of this Court, no way in which to contradict the assertion he makes. But it is the settled law of this State that the contents of medical books cannot be got before the jury, unless, as in the case of *Pinney v. Cahill, supra,* the expert is unwise enough to state that a certain book lays down a certain proposition. The fact that an expert witness can, if he be shrewd enough, carry an idea to the jury that he has fortified his opinion upon a given state of facts by an extensive reading of medical authorities, and yet keep himself clear from any contradictions from the

books themselves, is another potent reason why this
kind of evidence should be closely hedged and confined
within its legitimate sphere, and that no unfairness
should be permitted in its presentation to a jury. Unless
it is so kept within bounds, and closely scanned and
weighed by a jury, there is the greatest danger of a
perversion of justice."

Thus, despite the fact the Court recognized the
great dangers in allowing expert witnesses to tes-
tify and then not be effectively cross-examined, the
Court continued to follow the Michigan rule. The
rulings of these earlier cases have been followed
by the Court with very little discussion in *Fox v
Peninsular White Lead & Color Works,* 84 Mich
676 (1891);[2] *Hall v Murdock,* 114 Mich 233 (1897);
*Foley v Grand Rapids & Indiana R Co,* 157 Mich
67 (1909); *In re DuBois' Estate,* 164 Mich 8 (1910);
*Sykes v Portland,* 193 Mich 86 (1916); *People v
McKernan,* 236 Mich 226 (1926); *DeHaan v Win-
ter,* 258 Mich 293 (1932); *DeHaan v Winter,* 262
Mich 192 (1933); *Detroit v Porath,* 271 Mich 42
(1935); and *Anderson v Jersey Creamery Co,* 278
Mich 396 (1936).[3]

In *Anderson,* the Court said (p 402):

"In *People v. Millard,* 53 Mich. 63, the reason for this
rule is discussed at length. It is shown that the hearsay
testimony of written opinions of other persons should

---

[2] This case is distinguishable on its facts from other cases involving
cross-examination of medical experts. Plaintiff's counsel stated in
their brief to the Supreme Court that their purpose in using medical
texts was to prove that their views were sustained by standard
medical authorities. This is not a permissible purpose even in states
following the most liberal rule.

[3] This is the last case in Michigan which has been cited on the
subject of cross-examination of medical experts. In *Anderson,* the trial
court in granting a motion *non obstante veredicto* relied almost solely
on textbooks and on other evidence not introduced at trial. The
Supreme Court reversed holding that a decision must be on the
record as made at the trial. Thus, this case did not even involve the
issue of the cross-examination of medical experts.

not be submitted to a jury which has no means of examining the author as to his learning, honesty and sources of special knowledge. See, also, *City of Detroit v. Porath,* 271 Mich. 42; *People v. McKernan,* 236 Mich. 226; *DeHaan v. Winter,* 258 Mich. 293, and *DeHaan v. Winter,* 262 Mich. 192."

Thus, the Court recognized that the Michigan Supreme Court had not extended a thorough consideration to this issue since 1884. Moreover, there has been no case since 1936 which has even mentioned the problem.

The reasons given by the Court for not permitting such cross-examination were that the value of the particular authority was unknown, it could be unfairly used before the jury, and the contents of the book were hearsay.

We will now look at decisions from other jurisdictions which have dealt with this same issue.

## II.

The problem of the cross-examination of expert witnesses by the use of textbooks is an issue that has received a great deal of attention by courts and commentators alike. Several objections have been raised to allowing textbooks to be used on cross-examination. The first objection mentioned by the Michigan Supreme Court was that the use of this testimony was hearsay.[4]

One of the earliest cases to deal with this issue was *Laird v Boston & Maine R,* 80 NH 377, 117 A 591 (1922), which involved a suit for negligence

---

[4] *People v Hall, supra* 490; *People v Millard, supra* 76; *DeHaan v Winter,* 262 Mich 192, 197 (1933); *Ware v Ware,* 8 Me 42, 56 (1831); *Ashworth v Kittridge,* 12 Cush 193, 194 (Sup Jud Ct; Mass 1853); *Gallagher v Market Street R Co of San Francisco,* 67 Cal 13; 6 P 869 (1885); *Weyh v Chicago City R Co,* 148 Ill App 165, 168 (1909); *Percoco's Case,* 273 Mass 429, 430–431; 173 NE 515 (1930); *Tilghman v Seaboard Air Line R Co,* 171 NC 652, 657; 89 SE 71 (1916).

where plaintiff recovered a verdict and judgment. Plaintiff had cross-examined defendant's experts by the use of textbooks, and the Supreme Court of New Hampshire held this was proper. The Court stated (pp 377–379):

"The exception to evidence has been argued upon the theory that the plaintiff used the published opinion of an acknowledged authority as the basis for the cross-examination of the defendant's expert witness. The use of standard authorities to discredit such a witness is a matter upon which there is much diversity of opinion. The general practice in this state has been to permit such use upon cross-examination. *State v. Wood,* 53 N.H. 484 [1873]; *Burnham v. Stillings,* 76 N.H. 122 [79 A 987 (1911)].

"The objection to such procedure upon the ground that it violates the hearsay rule and permits the use of opinions which are not subject to cross-examination is unsound, or else it proves too much. If the opinion of one who is an authority cannot be used at all unless the holder of it be sworn and be subject to cross-examination, by what logic can the same inadmissible opinion be used as a basis for the admissible opinion of the expert witness? The opinion of the expert, qualified by study, is admitted as an exception to the hearsay rule. It is known to be founded upon the assertions of others. 1 Wig., Ev. *s.* 687. Whether it shall be admitted or rejected depends upon the witness' familiarity with the hearsay. Unless he is thoroughly versed in that hearsay, he is not qualified to testify. The reasoning of courts excluding inquiries about the authorities, upon the cross-examination of the expert, leads directly to the conclusion that the opinion of the expert should have been excluded. If the cross-examination puts before the jury the unsworn opinion of the authority, the direct testimony of the expert does the same thing, with the added infirmity involved in his recollection of what the authorities say.

"The objection to this procedure is unsound for another reason. It appearing that certain printed books are received by the profession as authorities and as

truly setting forth the views of certain authors, opinions based thereon are admitted in evidence. When the witness is confronted with the contents of one of these books which denies the views he has expressed, the issue presented is not whether the book states the true opinion of the author, but whether the witness has honestly and intelligently read and applied what is set down in the books. *Baldwin v. Gaines,* 92 Vt. 61 [102 A 338 (1917)].

"The argument which has prevailed in some jurisdictions is that the result of such cross-examination is to put before the jury, as positive evidence, the unsubstantiated opinions of the authorities referred to. The assertion that the object of counsel is not attained unless this is so *(Allen v. Railway,* 212 Mass. 191 [98 NE 618 (1912)]), is not warranted by the situation presented. The books abound in instances of evidence admissible and received for one purpose, but not for another. Before the improper use, or the objectionable motive, can be dealt with there must be proof of their existence. Neither is to be inferred from the mere fact that it might exist. The view that the opinions used upon cross-examination thereby become positive evidence leaves wholly out of consideration the fact that such opinions, being the foundation for the witness' opinion, are used solely to test its value, and assumes that trial courts and juries are either unable or unwilling to deal intelligently and fairly with restricted evidence. *Darling v. Westmoreland,* 52 N.H. 401, 412 [1872]. The inference that such use of the authorities was treated as substantive evidence is not drawn in this state, in the absence of proof. 'It cannot be inferred from the record of the cross-examination of Dr. Beaton that counsel understood he was putting the dispensatory into the case as substantive evidence, or was doing anything except seeking admissions from the witness to weaken the force of his testimony.' *Burnham v. Stillings, supra,* 127.

"Neither the illogical rule that hearsay should be received upon the direct testimony of an expert and excluded from his cross-examination, nor the idea that all expert opinion should be excluded because it violates the hearsay rule, has been adopted in this state. Opin-

ions are here received whenever it appears that they will be helpful. *State v. Killeen,* 79 N.H. 201, 202 [107 A 601 (1919)], and cases cited. And since the opinions are received, the just and reasonable corollary is that their value is open to investigation. The opponent may be permitted to test this value for various reasons and in various ways. There may be occasion to inquire whether the opinion is an honest one. Does it really express the views of the witness? If it be honest, does it represent the unanimous hearsay conclusion, or only a fragment of it? Has the witness made himself familiar with all the useful hearsay upon the subject, or only a part? Having testified to the sum of the useful hearsay, he may justly be inquired of touching the units of which the sum is composed.

"Cases where there is an evident abuse of this right by reading extended extracts from the authorities under the pretence of asking questions, or where the standing of the author (the fact that he is one of the authorities) rests upon the assertion of counsel, are not in point here. It was proved that Dr. Wood is an eminent authority, and the question objected to related directly and simply to the point in issue.

"No fact which tends directly to qualify or discredit the opinion given by the witness can be held to be inadmissible upon his cross-examination, as matter of law. The whole field of hearsay knowledge upon the subject is open to such investigation because of the nature of the opinion which has been received. How far this field can profitably be explored in a given case, is a matter to be determined by the justice who presides at the trial. His conclusion one way or the other is one of fact, and therefore not reviewable here. *Nawn v. Railroad,* 77 N.H. 299 [91 A 181 (1914)]."

In *Darling v Charleston Community Memorial Hospital,* 33 Ill 2d 326; 211 NE2d 253; 14 ALR3d 860 (1965), plaintiff sued for damages for allegedly negligent medical and hospital treatment which necessitated the amputation of his right leg below the knee. He recovered a judgment of $150,000 which was reduced by $40,000, the amount of the

settlement with the doctor. The Supreme Court affirmed as to the $110,000. One of the issues raised on appeal was the cross-examination of defendant's expert by the use of textbooks. The court stated (p 336):

"An individual becomes an expert by studying and absorbing a body of knowledge. To prevent cross-examination upon the relevant body of knowledge serves only to protect the ignorant or unscrupulous expert witness. In our opinion expert testimony will be a more effective tool in the attainment of justice if cross-examination is permitted as to the views of recognized authorities, expressed in treatises or periodicals written for professional colleagues. (Cf. Model Code of Evidence, Rule 529.) The author's competence is established if the judge takes judicial notice of it, or if it is established by a witness expert in the subject."

Wigmore in his treatise (6 Wigmore, Evidence [3d ed], § 1691), stated that the primary reason for the allowance of this evidence is that of necessity:

"The ordinary expert witness, in perhaps the larger proportion of the topics upon which he may be questioned, has not a knowledge derived from personal observation. He virtually reproduces, literally or in substance, conclusions of others which he accepts on the authority of the eminent names responsible for them. If, whenever this is discovered, we are to reject the evidence absolutely, then on all such matters the only resource is to search for a qualified expert, who may or may not be available within the jurisdiction. Even where such a person is legally procurable (all the chances being against it except in a few centres of population), the expense is frequently disproportionate. Costly litigation is the parasite of justice; and we pay too high a price when we refuse to accept our information from a competent source ready at hand."

Moreover, Wigmore stated that the circumstances attending publication of a learned treatise

gave a fair probability of trustworthiness. Section 1692 reads:

"(a) There is no need of assuming a higher degree of sincerity for learned writers as a class than for other persons; but we may at least say that in the usual instance their state of mind fulfils the ordinary requirement for the Hearsay exceptions, namely, that the declarant should have 'no motive to misrepresent.' They may have a bias in favor of a theory, but it is a bias in favor of the truth as they see it; it is not a bias in favor of a lawsuit or of an individual. Their statement is made with no view to a litigation or to the interests of a litigable affair. When an expert employed by an electric company using the alternating or the single current writes an essay to show that the alternating current is or is not more dangerous to human life than a single current, the probability of his bias is plain; but this is the exceptional case, and such an essay could be excluded, just as any Hearsay statement would be if such a powerful counter-motive were shown to exist.

"(b) The writer of a learned treatise publishes primarily for his profession. He knows that every conclusion will be subjected to careful professional criticism, and is open ultimately to certain refutation if not well-founded; that his reputation depends on the correctness of his data and the validity of his conclusions; and that he might better not have written than put forth statements in which may be detected a lack of sincerity of method and of accuracy of results. The motive, in other words, is precisely the same in character and is more certain in its influence than that which is accepted as sufficient in some of the other Hearsay exceptions, namely, the unwelcome probability of a detection and exposure of errors * * * .

"(c) Finally, the probabilities of accuracy, such as they are, at least are greater than those which accompany the testimony of so many expert witnesses on the stand. The abuses of expert testimony, arising from the fact that such witnesses are too often in effect paid to take a partisan view and are practically untrustworthy, are too well-known to repeat * * * . It must be conceded that those who write with no view to litigation

are at least as trustworthy, though unsworn and unexamined, as perhaps the greater portion of those who take the stand for a fee from one of the litigants.

"It may be concluded, then, that there is in these cases a sufficient circumstantial probability of trustworthiness. The Court in each instance should in its discretion exclude writings which for one reason or another do not seem to be sufficiently worthy of trust."

Our Court, while not accepting in earlier cases Wigmore's conclusion of admissibility, has recognized the serious problems of the reliability of the expert's opinion. Justice Morse, speaking for the Court, further stated in *People v Vanderhoof,* *supra,* 168:

"This case illustrates most forcibly the dangerous character of expert testimony, which has so often been called to the attention of the courts, and challenged by them. Here were professors from the University, and eminent physicians from the section of the State where the alleged crime was committed, summoned by the power of the people, and paid high prices *per diem,* for the purpose of establishing the fact that Vanderhoof must have died from the effects of arsenic administered before death. From the position they were employed to hold they could not be dislodged by the most rigid cross-examination, which laid before and fully presented to them the facts which, for a period of something over two years, by the people's own witnesses, from the lips of those who knew Vanderhoof while living, tended to show that the deceased was troubled with the same symptoms which culminated in his death, and which, as they admitted, might be attributable to heart disease. Nearly every one of them, at last, was obliged to rest his assumption of death by arsenical poisoning upon the fact that arsenic was found in the body after death."

The Court continued (p 172):

"It has been declared by the courts that expert testimony is not of the best or highest order, and that it is

extremely dangerous, unless well guarded, and closely confined within its legitimate province. It is often necessary, as in this case, in order that justice may be done; and without it the truth cannot always be determined. But it is a fact well known to every practitioner at the bar, and within the judicial knowledge of courts, I think, that latterly the experts, on both sides of a cause, become too often eager attorneys before the trial is ended and before their testimony is given. It therefore becomes desirable, and necessary to the due administration of justice, that the scope and power of their utterances shall not be extended; that they shall be held strictly to the rules laid down for their guidance and control. Especially should this be so in criminal cases, where the liberty for life of the accused is at stake."

Thus, our Court has consistently recognized that the expert testimony of witnesses is in all probability far less reliable than the testimony that is derived from textbooks. The fact that the textbooks used on cross-examination would contain hearsay material is not a sufficient justification to prevent this type of cross-examination in view of the countervailing arguments in favor of admissibility.[5]

A second argument used to exclude cross-examination of experts by the use of textbooks is that science is shifting; that new discoveries quickly outdate medical textbooks and thus such books are not trustworthy.[6] This, however, is not a satisfactory objection. If a book is outdated, the expert will refuse to recognize it as authority. If a new discovery has occurred since the publication of the textbooks, the expert has the opportunity to ex-

---

[5] For other authorities dealing with this objection to the use of textbooks to cross-examine expert witnesses, see Holz, *Learned Treatises as Evidence in Wisconsin,* 51 Marquette L Rev 271 (1967–1968); Dana, *Admission of Learned Treatises in Evidence,* 1945 Wis L Rev 455, 459–460; *Ruth v Fenchel,* 37 NJ Super 295; 117 A2d 284 (1955), *aff'd* 21 NJ 171; 121 A2d 373 (1956).

[6] *Wilcox v International Harvester Co of America,* 198 Ill App 33, 40 (1916), *aff'd* 278 Ill 465; 116 NE 151 (1917).

plain this to the jury. (Indeed, in such a situation, the expert's credibility would be enhanced since he would appear to be more knowledgeable than the textbooks.)

6 Wigmore, Evidence (3d ed), § 1690, states:

"There is ignorant exaggeration in these charges. They attribute to the entire body of scientific knowledge the instability due to casual rapid progress in certain departments of the sciences; and they ignore even in those departments the small proportion which the field of possible change bears to the large area of established truth. But, leaving this aside, we find that the objection is in itself inconsistent with accepted legal practices, and would if consistently applied exclude all testimony even on the stand from scientific witnesses. For if these works are rejected because they may not embody the latest results of science, what shall be said of specialist witnesses in general? Out of the hundreds of scientific experts who are this month testifying in courts of justice, how many are speaking from a thorough acquaintance with the latest researches in their subjects? For how many of them is it possible to maintain steady pace with the daily progress of science? How many are not testifying on information obtained at a medical or other technical school a decade or more ago, in the standard books of that day? It is true, where conflicting views are advanced and an expert cannot state his views to be founded on the most recent investigations, that his views are naturally entitled to inferior weight; but could it seriously occur to any one to exclude all experts from the stand, not because this or that one has in fact no acquaintance with the recent literature of his profession, but because many among the whole body *may* not possess such acquaintance?"[7]

Two other reasons not cited by the Michigan Supreme Court, have been offered by other courts in preventing the use of textbooks on cross-examination. They are: 1) that there is danger in confus-

[7] See, also, *Kern v Pullen,* 138 Or 222, 227; 6 P2d 224 (1931).

ing a jury by technical passages without oral comment and simplification; and 2) that the treatises may be used unfairly by taking passages which are explained away or contradicted in other parts of the book.[8]

The simple answer to both of these assertions is that opposing counsel may either ask questions of his client to explain the meaning of technical passages, or point out that the text is inaccurate, or, he may call other experts to take the stand to explain the technical passages.[9]

We, therefore, believe that none of these objections is sufficient to prevent the use of recognized texts as a means of cross-examining expert witnesses. Moreover, another consideration militates in favor of the use of textbooks in the cross-examination of expert witnesses. That consideration is the practical difficulty in obtaining experts to testify in malpractice cases. As our Court recognized in *People v Vanderhoof, supra,* 172–173:

"In this case the experts were all on one side. It is claimed, and the evidence would seem to warrant the claim, that the respondent was not able to hire experts to testify in her behalf. It is probable that in cases of this kind the truth will ever be clouded with the sophistry of scientists until some way or method is devised by which expert witnesses can be procured who

---

[8] This appeared to be a concern of our Court in *People v Millard,* 53 Mich 63, 76 (1884): "If the opinion of an author could be received at all, it should be from his own words—not in single passages, but in combination." See, also, *Connecticut Mutual Life Insurance Co v Ellis,* 89 Ill 516, 519–520 (1878), where the Court stated: "Great care should always be taken by the court to confine such cross-examination within reasonable limits, and to see that the quotations read to the witness are so fairly selected as to present the author's views on the subject of the examination."

[9] For an example where counsel for plaintiff was permitted to read a full statement from a textbook on redirect examination after counsel for defendant had read a partial statement on cross-examination, see *State v Bess,* 60 Mont 558, 569–570; 199 P 426 (1921).

will be, and remain through the trial, entirely uninterested and unbiased, not only in the result of the trial, but also in the maintenance of their own peculiar notions or theories in regard to matters presented to them upon the trial. Until the time comes when experts shall be entirely fair and unbiased, with no desire upon the witness-stand except to arrive at the truth, it must be the duty of the courts to see that no injustice be done, if that be possible."

We, therefore, hold that medical textbooks or other publications may be used to cross-examine expert witnesses if the expert recognizes the publication as authoritative, or if the trial court takes judicial notice of the publication as authoritative. See *Darling v Charleston Community Memorial Hospital, supra,* 336.[10] *Dolcin v Federal Trade Comm,* 94 US App DC 247, 252 (fn 4); 219 F2d 742, 746 (fn 4) (1954).

Great caution must be exercised by the trial court to ascertain that the authority cited is pertinent to the subject matter under consideration and passages which are irrelevant are not admitted into evidence. See *O'Dowd v Linehan,* 385 Mich 491 (1971).

## III.

Of great persuasion to our rule that the use of

---

[10] Many cases that do not follow the liberal rule actually are based on the fact that the textbooks in question were not recognized authorities. These decisions are correct on their facts but are often incorrectly used as precedent for a restrictive rule of cross-examination of experts. See *Dolan v O'Rourke,* 56 ND 416; 217 NW 666 (1928); *Drucker v Philadelphia Dairy Products Co,* 35 Del 437; 166 A 796, 798 (1933); *Farmers Union Federated Cooperative Shipping Assn v McChesney,* 251 F2d 441, 445 (CA 8, 1958); *Briggs v Chicago Great Western R Co,* 238 Minn 472; 57 NW2d 572 (1953); *Eckleberry v Kaiser Foundation Northern Hospitals,* 226 Or 616; 359 P2d 1090 (1961); *Wall v Weaver,* 145 Colo 337, 339, 341; 358 P2d 1009 (1961); *Ross v Colorado National Bank of Denver,* 170 Colo 436, 445; 463 P2d 882 (1969).

textbooks in the cross-examination of the testimony of expert witnesses, even though the expert witness does not state that he relies on the specific authority but does recognize the text as authoritative, are the rulings of the highest tribunals of our sister states in this regard. When our Court last considered this problem in *Anderson v Jersey Creamery Co, supra,* the states of California, Colorado, Illinois, Iowa, Massachusetts, New Jersey, North Carolina, North Dakota, South Carolina, Vermont and Wisconsin, all supported the Michigan rule. See Annotation—*Cross-Examination of Expert,* 82 ALR 448. However, since that time, the states of California *(Gluckstein v Lipsett,* 93 Cal App 2d 391; 209 P2d 98 [1949]; *Salgo v Leland Stanford Jr. University Board of Trustees,* 154 Cal App 2d 560; 317 P2d 170 [1957]); Illinois *(Darling v Charleston Community Memorial Hospital, supra);* North Dakota *(Iverson v Lancaster,* 158 NW2d 507 [ND 1968]); New Jersey *(Ruth v Fenchel,* 37 NJ Super 295; 117 A2d 284 [1955], *aff'd* 21 NJ 171; 121 A2d 373 [1956]), have all modified the rule to some extent. Annotation: *Expert Witness—Cross Examination,* 60 ALR2d 87–95.

The United States Supreme Court, which had recognized the narrow Michigan rule in *Davis v United States,* 165 US 373; 17 S Ct 360; 41 L Ed 750 (1897), recognized a more liberal approach in *Reilly v Pinkus,* 338 US 269; 70 S Ct 110; 94 L Ed 63 (1949).[11] Our sister state of Illinois in *Darling v Charleston Community Memorial Hospital, supra,* recently recognized the rule that we accept today. The Supreme Court of New Jersey in *Ruth v Fenchel, supra,* also recognized the liberal rule.

---

[11] The Court stated (p 275): "It certainly is illogical, if not actually unfair, to permit witnesses to give expert opinions based on book knowledge, and then deprive the party challenging such evidence of all opportunity to interrogate them about divergent opinions expressed in other reputable books."

Moreover, the drafters of the Model Code of Evidence and the Uniform Rules of Evidence would go beyond this rule and permit the admissibility of textbooks as substantive evidence. Thus, the clear trend of the courts and the commentators is to permit a liberalization of the restrictions against cross-examination and allow the cross-examination of medical experts by the use of authoritative medical textbooks. We, therefore, hold that the trial court committed error in excluding plaintiff's cross-examination of defendants' expert witness by the use of such textbooks. To the extent that earlier Michigan cases prevented such cross-examination, they are overruled.

We have thoroughly reviewed plaintiff's 12 other allegations of error and find no merit to any of them.

The judgment is reversed and the cause is remanded for a new trial. Costs to plaintiff.

T. M. KAVANAGH, C. J., and ADAMS, T. E. BRENNAN, T. G. KAVANAGH, and WILLIAMS, JJ., concurred with SWAINSON, J.

BLACK, J. *(dissenting).* This suit for medical malpractice was tried to a jury in 1969. The jury's verdict was negative. Judgment entered accordingly. Bypass of the Court of Appeals was granted September 23, 1970 (384 Mich 760). The appeal was subjected to conference and finally submitted June 10, 1971.

Since then our majority must have labored, conferred, caucused and searched—surely without surcease and in mighty unison—to find some or any colorable way to overrule as now due for entry; the Court's opinion not having been delivered to the writer until July 11, 1972, some ten days ago. Recalling a fair aphorism of some de-

spairing writer upon the injustice of delayed jus-
tice,[1] I hasten to respond—partly from notes made
when the appeal with salient issue was fresh in
mind—in time for the filing of these pro and con
opinions on our next "Judgment Day" (July 26,
1972).

Our reports, printed thus far in 1971–1972, are
on the shelves of thousands of lawyers and judges.
They bear now undeniable witness of both a pro-
faning and deplorable fact; that this temporally
seated and largely fledgling Court is bent purpose-
fully upon progressive destruction of all or near all
of the great canons and precedential precepts
which the nationally revered COOLEY Court, and
the succeeding FELLOWS Court, have bequeathed to
Michigan. In this latest case the employed means
of destruction are drawn prominently from Profes-
sor Wigmore's gratuitous invention of a new legal
term—"Learned Treatises" (which I accept for
present purposes)—and from a naked *dixit* which
the professor has hurled at targeted decisions
expressly including *People v Hall,* 48 Mich 482
(1882).[2] By this Topic IX, the professor alleges that
the applied reasoning of those decisions amounts
only to "ignorant exaggeration", despite acknowl-
edgment that what he stands for—by Topic IX—

---

[1] "Some regard must be had for the shortness of human life."

[2] Perhaps, at this stage, the thoughtful reader of our respective
contributions might well pause for comparison of the Court's opinion
of *People v Hall* with the professor's creed (6 Wigmore on Evidence
[3d ed], "Topic IX: Learned Treatises", pp 2–22). There he will find in
perfect array the real and the practical on one hand, and the
visionary notions of a professional theorizer on the other.

If any Brother can find in Topic IX any inkling of actual experience
in the presentation of evidence, or of having learned what one may
only learn by years spent on the lower level of trial courtrooms,
doubtless he will trot it forth by amendment or addition to the
Court's opinion. No better support for the decisions the Brothers are
set now to overrule can be found or made than that which appears in
Wigmore's own stilted criticism thereof. I mean later to pluck out a
few of these curious gems for unceremonious comment.

"has obtained *complete* recognition *in only one or two jurisdictions"* (p 2).

Having reviewed the Court's opinion in conjunction with entire Topic IX, I perceive no need for defense of *People v Hall, supra,* and the Michigan cases that have followed it all these years. All such cases, devoid as they are of the speculations of pedants and the collegiate whimsies of law reviewers, have since the 1880's breathed common sense into our trial courtrooms and are guarded adequately by the great weight of reasoned authority.[3] I propose instead to inquire whether the professor and our temporal majority are not themselves guilty of such "ignorant exaggeration". As a sort of prelude, it is suggested respectfully that just about all of the doctrines written in Topic IX had to be bred, and then inbred, on the campuses of our more effete law schools where theories are taught apart from that down to earth wisdom one may gain only by years of preparing and trying, and winning and losing both in trial and appellate courts, a plethora of contested actions. Let me try this out.

I have declared above an intent to pluck, from Topic IX, a few selections for comment. This may be unnecessary, for if the reader by this time has perused that topic contemplatively, along with the *judicial* authorities which the professor disparages, he will have identified enough "ignorant exaggeration" to satisfy himself. Yet I cannot resist comment upon a few of the impractical notions one finds in Topic IX.

---

[3] This is a fact our majority tacitly concedes by its painful assembly of a minority of states which, as the Brethren dare no more than say, "have all modified the rule to some extent" *(ante* p 119). Aye, the minority has *modified to some extent;* not *destroyed* as the gentlemen of this Court are about to record. The "extent" is not of course described or proposed.

Wigmore starts out, under (1) on page 2 of Topic IX, by alleging that "[t]he only forceful" objection to what he advocates is that the author of such a learned treatise, not having been called to the stand, is "a person not subjected to cross-examination". (Yes, it is a bit forceful.) Then, moving to (2) on page 3, he identifies the next objection he would overrule. It is that a "medical book which was a standard last year becomes obsolete this year". Then comes that long paragraphic tirade headed "There is ignorant exaggeration in these charges". In the body thereof the professor presents a series of altiloquent questions. After quoting each I shall endeavor to respond by "Comment".

Wigmore: "For if these works [learned treatises] are rejected because they may not embody the latest results of science, what shall be said of specialist witnesses in general?"

Comment: Only this: By the question that specialist witness is *on the stand.* The author of the learned treatise *is not.* The counsel has not sought to take that author's deposition, if perforce the latter is beyond reach of the court's process. Nor has the counsel bothered to explain why he has neither deposed nor subpoenaed the author. Even if the author is available for deposition or summon by subpoena, the counsel (after interview) may have concluded that the "learned treatise" itself would make more mileage in the juryroom than would the testimony of its writer, or that the testimony of the writer might slaughter an auspicious case for damages or, if such be the case, weaken seriously an equally promising defense.

So here comes the reasty hearsay of Topic IX. Counsel, encouraged from here on by this Court,

purposely and subtly will cull for cross-examination—out of the multiplying pro and con myriads thereof—publications the *verity* and *reliability* of which need be supported only by general questions and uncertain answers the negative sum of which becomes just what this trial judge found. Under *Jones v Bloom* this will be done without pretense of showing that the writers thus winnowed are *not* available for deposed or witness chair attestation of what they have published, locally or distantly. It will be done with no showing that not one witness is available to prove the qualification or qualifications of any such writer—to make "statements upon the subject in hand" (per Wigmore's suggestion, § 1694, quoted post), and it is bound to make of medical malpractice trials veritable wars of even more lengthy attrition; with each side employing such a published congeries of conflicting medical views as would thoroughly confusticate any jury the members of which, like all of us outside the medical profession, are not equipped to interpret and apply medical books. Once real hearsay is let loose in our trial courtrooms, farce and foolishness take over and the added public as well as private expense thereof cannot help but lead to more "no fault" compensation.

Wigmore: "Out of the hundreds of scientific experts who are this month testifying in courts of justice, how many are speaking from a thorough acquaintance with the latest researches in their subjects?"

*Comment:* Again, by this question, that scientific expert *is on the witness stand.* No phantom of hearsay is he. Naturally he is asked to state not only the extent of his knowledge but also his opinion of such "latest researches". Is there something wrong, or highly improper, about that? Some

expert or experts thus interrogated might surprise the examining counsel and every one in the courtroom by the utter currency of their knowledge; just as others might fail miserably, and just as any learned treatise might prevail or fail should its author be deposed or called before the jury to prove, if he can, the *present* dependability of what he has written.

Professor Wigmore has touched here, quite unwittingly, the tender nerve of what he advocates; for much more now than in 1940 is it true (Topic IX p 3) that *"Science is shifting;* that experiment and discovery are continually altering scientific theories and rendering them valueless."

Wigmore: "For how many of them is it possible to maintain steady pace with the daily progress of science?"

*Comment:* Same answer. Just cross-examine each of them as ever before. Isn't that the best way, compared with easygoing employment of hearsay, as proposed by Topic IX? One cannot, as observed below by trial judge Kaufman, "cross-examine the book".

Wigmore: "How many are not testifying on information obtained at a medical or other technical school a decade or more ago, in the standard books of that day?"

*Comment:* A definite minority I would say, always ascertainable by cross-examination. Really, this question emphasizes the need for drawing out the decade-indicative fact by vigorous interrogation of any expert who attempts to vouch in a "learned treatise" written years ago.

I must terminate this testimonial portrayal now, for Professor Wigmore has in Topic IX presented no more such questions. Nonetheless he has sup-

plied an even more forceful reason for my present disagreement with the Brethren in majority. Incredibly, they have ignored totally the need of laying a definite foundation for employment in court of these learned treatises when the authors thereof are not—on account of death, disease, disinclination, or disappearance—within reach of depositional or other judicial process. Said § 1694 provides:

"§ 1694. *Testimonial Qualifications; Production of Original.* (1) The treatise-writer must, like every other witness, be shown before hand to be properly *qualified* to make statements upon the subject in hand. This will require, as in other Hearsay exceptions *(ante,* § 1424), another witness who will testify to these qualifications, —which means here the summoning of any one in the profession, art, or trade of the writer and ascertaining from him the writer's standing as an authority. This removes the danger of an ignorant use of statements by writers of no standing; but it is merely the application of the general principle as to testimonial qualifications. It is done even in those jurisdictions *(post,* § 1637) where the Exception is recognized only in a fragmentary form. Practically, also, it guards against the supposed danger, already adverted to, of allowing the jury to be confused by book-passages offered without explanation; for the expert who indorses the book can also be used to make explanations where desirable. It also forbids, of necessity, the loose and unsafe practice *(post,* § 1700), followed in some jurisdictions, of permitting counsel to read indiscriminately to the jury, as a part of his argument, extracts from scientific treatises, and furnishes the real reason why this is to be condemned.

"(2) The rule of *production of the book itself (ante,* § 1179) also applies, where it is desired to employ a specific book; but this does not forbid asking the witness a general question as to the opinion of the profession."[4] (Italics by Wigmore.)

---

[4] Was any effort made here to show, "beforehand" that any author involved was "properly qualified to make statements upon the subject in hand."? There is no smidgen thereof. See the appendix, *post* p 137.

In the light of § 1694, I present here the specific question this plaintiff-appellant has presented for answer (stated question II):

"Did the trial court commit prejudicial error by requiring an admission from a medical witness that he relied on a certain textbook in the formulation of the opinions expressed in court as being the only basis upon which such a medical witness could be cross-examined?

Her counsel goes on to outline his argument this way:

"Plaintiffs were prevented from using these books as a basis for cross-examination, because of the so-called Michigan rule which only permits the use of such books if a witness testifies that he relied on such a book in giving his testimony."

When an important question of law like this comes up for review, it is wise to ascertain with utmost precision just how that question arose, and then came to submission and ruling, in the trial court. Should the Court fail in that regard, it makes only for more compound fractures of our decisions—of which already there are too many.

The majority says, without quotation or reference:

"At the trial, plaintiff's attorney attempted to cross-examine Dr. Attenson by reading excerpts from textbooks which Dr. Attenson testified he recognized as authoritative. It is conceded that Dr. Attenson had not relied upon these textbooks as authority for answers to previous questions, and the trial court, relying on previous Michigan Supreme Court decisions, refused to permit such cross-examination."

This just isn't right, either in record or actual fact. Rather than argue with the Court over a matter of such critical nature, I have instead

included by separate appendix *(post* p 137) *all* of
Dr. Attenson's cross-examination that might possi-
bly be said as having formed a basis for review of
stated question 2. Careful reading of that appen-
dix, by the profession, is respectfully invited. I
need but quote here the parts with respect to
which the trial judge took part, leaving the rest
for contemplative reading of the more lengthy
appendix:

*"The Court:* \* \* \* Now, let me ask you this. Is this
book an authority?

*"The witness:* It is one of many.

*"The Court:* Okay. And do you base your opinion
upon this book, the opinions that you have experienced
as to how anesthetics should be administered?

*"The witness:* Well, honestly, I don't.

*"The Court:* You don't? All right. And then I guess
that answers the question then, counsel.

"Here is the law in Michigan, very precisely and
concisely:

" 'The only circumstances under which medical books
can be read in evidence are where the witness has
based his opinions upon them and has referred to them
as authority.'

"And evidently, he said he doesn't base his opinions
upon that book."

\*     \*     \*

*"Q. (by Mr. Peisner [plaintiff's counsel] continuing):*
Doctor, I will ask you once again: To the extent that
you base your opinion on any book, do you base it on
this Monheim book?

*"A.* Not that book specifically. I'm sorry, I can't
honestly say that.

\*     \*     \*

*"Q. [by Mr. Peisner continuing]* Do you have any book
that you base your opinion on?

*"A.* I don't think you can specifically say one book; it
is the sum total of your entire exposure.

"*The Court:* I guess he has answered the question, counsel." * * *

There was no offer, or declaration of intent to offer, any of these "books" as evidence. No request for inclusion thereof in the record was made. None were marked for identification and maintained in the record that way, so that the trial judge (and an appellate court in turn) might review them for evidentiary utility or admission for a specific purpose. No one of such "books" was shown to the witness, for examination by him, nor was any specific portion thereof called to his attention for the purpose of desired interrogation. Nothing can be found in the original record that appears to be a book, or a text, or perhaps a learned treatise. No effort was made to obtain a separate record of the cross-examination desired. As to that see GCR 1963, 604 and *Bujalski v Metzler Motor Sales Co,* 353 Mich 493, 497–499 (1958), and cases cited therein. For aught this Court knows or the trial judge knew from the record, Messrs. Collins, Vandam, Monheim, Dripps, Eckendouf and Nuy were not writers of published "learned treatises" within Wigmore's contemplation or, say, within the more extreme purview of (thus far unacceptable) Rule 529 of the Model Code of Evidence, p 294:

"Rule 529. *Learned Treatises.*
"A published treatise, periodical or pamphlet on a subject of history, science or art is admissible as tending to prove the truth of a matter stated therein if the judge takes judicial notice, or a witness expert in the subject testifies, that the writer of the statement in the treatise, periodical or pamphlet is recognized in his profession or calling as an expert in the subject."

*To summarize:* Of the specific point brought to review it is enough to say that Judge Kaufman

was not exactly interested in any kind of notice, judicial or otherwise, of these unsworn publications. Nor has any member of the Court declared himself ready to thus notice any of them. And so far as concerns our yet undemolished rule, that a medical witness must first refer "to a textbook as his authority" before it may be used to contradict him *(DeHaan v Winter,* 258 Mich 293, 299 [1932]), the profession is referred to the continuant appendix hereof to see whether Dr. Attenson at any point did so refer.

Here then is the appeal which the Court has chosen for arrant demolition of a really learned treatise, *People v Hall, supra,* the levelheaded sense of which, both in this Court and in our trial courts, has since the 1880's protected both plaintiffs and defendants in medical malpractice from the treachery of the worst kind of hearsay; the kind that is apt to impress the unwary by the mere fact of its having been printed and published somewhere and sometime in the past. Strangely, it seems too often that when someone writes a book, or an article, or a treatise of any kind for publication, he thereby becomes an "expert"; as if print could make him a specialist or masterhand. The conclusion is not apt to be quite so common in the author's home town, where he is known personally (as he ought to be in the courtroom when anyone seeks to read his published ideas to a sworn jury).

For comparison with the best our majority has been able to strain—after a year's work—from minority writings picked and chosen here and there from other states, I submit below that kind of practical knowledge and legal experience out of which sound judicial precedent can only be made *(People v Hall, supra,* 490–491):

"We observe that resort was had to reading medical

books to the jury, the record not showing, however, what matters were thus laid before them. If this was anything it was evidence, and probably evidence which was used with some effect. The practice is not permissible. Scientific or expert testimony must be given by living witnesses who can be cross-examined concerning their means of knowledge and can explain in language open to general comprehension what is necessary for the jury to know. The only legal reason for allowing the evidence of opinions is found in the presumption that an ordinary juryman or other person without special knowledge could not understand the bearing of facts that need interpretation. Medical books are not addressed to common readers, but require particular knowledge to understand them. Every one knows the inability of ordinary persons to understand or discriminate between symptoms or groups of symptoms, which cannot always be described to those who have not seen them, and which with slight changes and combinations mean something very different from what they mean in other cases. The cases must be very rare in which any but an educated physician could understand detached passages at all, or know how much credit was due to either the author in general or to particular parts of his book. If jurors could be safely trusted with the interpretation of such books, it is hard to see on what principle living witnesses would be required. Scientific men are supposed to be able from their study and experience to give the general results accepted by the scientific world, and the extent of their knowledge is tested by their personal examination. But the continued changes of view brought about by new discoveries in most matters of science, and the necessary assumption by scientific writers of some technical knowledge in their readers, render the use of such works before juries—especially in detached portions and selected passages—not only misleading but dangerous. The weight of authority as well as of reason is against their reception."

I vote of course to affirm.

*SUPPLEMENT* (August 26, 1972):

The foregoing opinion of dissent was delivered to

the other Justices July 21. In it I made reference
to our then upcoming day of judgment (July 26)
and to the need for decision of a case submitted
last year, June 10, 1971 to be exact.

July 26 Justice Adams held up determination of
this appeal. Now the Court's next judgment day is
August 29. Today I have examined a memo sent
out under date of August 24, by Justice Swainson,
author of the foregoing majority opinion. It advises
that Justice Adams has proposed and he has
agreed to insert a new paragraph in the Court's
opinion, reading as follows:

"Great caution must be exercised by the trial court to
ascertain that the authority cited is pertinent to the
subject matter under consideration and passages which
are irrelevant are not admitted into evidence. See
*O'Dowd v Linehan,* 385 Mich 491 (1971)."

I agree there will be a vigilant need for "[g]reat
caution" on the part of our trial judges as they
attempt to determine and apply what by its opin-
ion the Court's majority seems to want done, and
would dwell a bit upon that need in view of
employment, not only of the above quoted "[s]ee
*O'Dowd",* but also of that same "see" on the same
page of the Court's opinion; in each instance with-
out specific or other lead to what the Court has in
mind.

Obediently, I have read anew Justice Adams'
opinion of *O'Dowd.* In it I find nothing that even
remotely tends to provide light for this "[g]reat
caution" paragraph. The latter seems purposed
toward precise pertinence and relevance of "the
authority cited"; but in *O'Dowd* no "authority" or
publication was cited, or produced, or involved in
any way. In *O'Dowd* Justice Adams was engaged
in another field; that of defending some—but defi-

nitely not all—of the so-called expert testimony of a professional witness, self-styled "an accident reconstruction expert". No publication or "learned treatise" was relied upon by any party in *O'Dowd,* either as evidence or for the purpose of cross-examination. Hence it is deferentially suggested that the profession, when interested in identifying if possible the new rule ordained by *Jones v Bloom,* will gain nothing by "seeing" *O'Dowd.*

In recent years we have treated the Bar and our lower court benches to prolix writing, pro and con, upon the extent to which "standards" must be set forth in statutes on peril of constitutional veto by this Court. Pinpointed examples will be found in both opinions of *City of Pleasant Ridge v Governor,* 382 Mich 225 (1969) and currently in both opinions of *People v Fields,* 388 Mich 66 (July 26, 1972).[5] Why, *People v Fields* having set the Court's new tenor of desired "standards", should not the trial lawyers and trial judges of Michigan be supplied just a few understandable patterns, if not a norm or two, for application of what in hazy outline we are told to "see"?

Taking that new "[g]reat caution" paragraph in conjunction with the preceding "[w]e, therefore, hold" paragraph of the Court's opinion, let me expose just one of the manifest doubts today's majority has inserted like a wrench into our hitherto worthy evidentiary machinery. Going through the majority opinion with care, the reader will find that our trial judges are provided no gauge and no guide to what should be done when the expert brought to the stand—whether called by the plaintiff or by the defendant—warily refuses on cross-examination to "recognize" as *presently* authentic

---

[5] In the *Pleasant Ridge* case Justice ADAMS dissented. In the *Fields* case his opinion on "standards" prevailed.

any publication or publications which the cross-examiner has submitted to him. When that occurs (as all but the naive will surely expect), and the cross-examiner moves that the trial judge judicially notice the submitted publication, what can or should the trial judge do—without risking this Court's second-sighted animadversion?

The only answer I am able to glean[6] from these inscrutable paragraphs of the Court's opinion is that the Brethren, by telling us only to "see" *Darling v Charleston Community Memorial Hospital,* 33 Ill 2d 326; 211 NE2d 253; 14 ALR3d 860 (1965) and *Dolcin Corp v Federal Trade Comm,* 94 US App DC 247, 252; 219 F2d 742 (1954) *(cert den* 348 US 981; 75 S Ct 571; 99 L Ed 763),[7] has provided a pretty tough choice for the trial judge; the two cases not being exactly in harmony with each other and *Dolcin,* a Federal decision, having made very clear the outside limits of *Reilly v Pinkus,* 338 US 269; 70 S Ct 110; 94 L Ed 63 (1949), upon which the majority mistakenly depends *(ante* 119).

*Darling,* as I shall demonstrate by full quotation of its 15th paragraph, goes sled length for the not

---

[6] There may be just another, discernible only by divination from our parade of recent opinions of reviewed damage actions. If the *plaintiff's* counsel demands judicial notice of his pet publication or publications, then grant the demanded notice. If the *defendant's* counsel insists upon notice of his favorite or favorites, that will be time for the exercise by the trial judge of the mandated "[g]reat caution."

[7] Here is footnote 4 on p 252, the reference being to *Reilly v Pinkus:*

"4. The Court does not say how the authority of those works is to be determined. It seems clear from the facts given in the opinion that it is unnecessary for the witness himself to recognize the authority of the work [but see *Lawrence v Nutter,* 4 Cir, 1953, 203 F2d 540] or even to have read it [but see *Shaw v Duncan,* 10 Cir, 1952, 194 F2d 779]. We think the authority of the work is for the presiding officer to decide. And we think he should have a broad discretion in determining what—and how much—evidence may be presented on that question."

yet acceptable doctrine of Rule 529 of the Model
Code of Evidence (which I have previously quoted,
*ante*).[8] *Dolcin,* on the other hand, drawing from
*Reilly v Pinkus, supra,* declares that the judge or
presiding administrative officer "has broad discre-
tion to determine the extent of the cross-examina-
tion on written authorities"; also that application
of the rule of *Reilly v Pinkus, supra, depends upon
a fact;* that the expert on the stand has based "an
opinion to a significant degree upon his reading."

Arrayed below, for comparison, are the textual
presentations of *Darling,* and then of *Dolcin. Dar-
ling,* having criticized the rule our majority now
overrules, proceeds by its 14th paragraph largely
upon the alleged strength of Wigmore's doctrine
(15th paragraph of *Darling):*

"The unsatisfactory quality of expert testimony has
been the subject of frequent comment, and it has in-
duced judicial action. (See *Opp v Pryor,* 294 Ill 538, 545;
128 NE 580 [1920]; *Kemeny v Skorch,* 22 Ill App 2d 160,
170; 159 NE 2d 489 [1959]; see also Supreme Court Rule
17—2, Ill Rev Stat 1963, chap 110, par 101.17—2;
Cleary, Handbook of Illinois Evidence, secs 3.3, p 41,
11.10, pp 190–191.) An individual becomes an expert by
studying and absorbing a body of knowledge. To prevent
cross-examination upon the relevant body of knowledge
serves only to protect the ignorant or unscrupulous
expert witness. In our opinion expert testimony will be
a more effective tool in the attainment of justice if
cross-examination is permitted as to the views of recog-
nized authorities, expressed in treatises or periodicals
written for professional colleagues. (Cf. Model Code of
Evidence, Rule 529.) The author's competence is estab-

---

[8] *Darling* also, by its 14th paragraph, seems to adopt Rule 63 of the
Uniform Rules of Evidence. That rule bans hearsay evidence "except:
* * * (31) Learned Treatises. A published treatise, periodical or
pamphlet on a subject of history, science or art to prove the truth of a
matter stated therein if. the judge takes judicial notice, or a witness
expert in the subject testifies, that the treatise, periodical or pamphlet
is a reliable authority in the subject."

lished if the judge takes judicial notice of it, or if it is established by a witness expert in the subject."

*Dolcin,* on the other hand, tells us about *Reilly v Pinkus, supra,* and proceeds (p 252):

"*Reilly v Pinkus,* we think, stands for the general proposition that an expert witness who bases an opinion to a significant degree upon his reading may be cross-examined as to that opinion by reference to other reputable works in his field. It is not necessary for the witness to have relied in his testimony upon the particular authority the cross-examiner seeks to use. And we do not think that the Court limited its ruling to cases involving fraud. The *Reilly* case also holds that the trial examiner has broad discretion to determine the extent of the cross-examination on written authorities. He probably has, in some cases, discretion to determine whether there should be any such cross-examination at all. But it is error to exclude such questions by blanket rule, without more."

Is this question of judicial *notice* to be one of judicial *discretion,* depending upon the judge's own perusal of that which is tendered for *notice?* May the trial judge, in effort to determine this novelty of judicial notice, employ the usual and customary rules by which judges take or refuse notice, or— not being a medic or expert skilled other than at law—must he resort to study of each submitted text or publication to make his decision? What if counsel on both sides, each armed with a trunk-load of publications the quality and currency of which is warily avoided by all called experts, insist regardless upon judicial notice of all of their respective wares? Are we not—now—committed to a new and uncertain field of judicial notice where, the trial judge having read parts or portions of proffered Hirsute On Headaches countered by Fuzzy On Diseases of the Head, is required to

choose between the two (or tell the jury to choose), even though Hirsute and Fuzzy have not been sworn and the only verity of their "learned" treatises is the fact of printing and publication thereof, say at Walla Walla, or Oshkosh, or Bad Axe? I think it high time for retort that this Court of 1971–1972 has already made of itself a tear-down tribunal of precedential demolition; one with insufficient capability of construction anew of that which might at least equal in excellence and eminence what is so airily destroyed.

I conclude with due remark that if there is to be, in Michigan, judicial discretion to· deny such a projected cross-examination as well as discretion to grant same, Judge Kaufman below had far better reason to say "nay" when he did than "yea". Consider the appendix hereof, and note my thus far unchallenged detail of the way the question discussed in our respective opinions is supposed to have been raised and saved for review.

## APPENDIX

(That part of the cross-examination of Dr. Attenson dealing with identity of and claimed reliance upon medical publications.)

*Q. [by plaintiff's counsel, Mr. Peisner]:* Doctor, I will ask you, is Principles of Anesthesiology by Vincent Collins one of your authorities for the administration and use of anesthetics, anesthesia?

*A.* No, I wouldn't say that it really is. I did not use that book to any great extent while I was in training. There are so many, it is difficult to isolate one solitary book.

*Q.* All right, what is your authority?

*A.* Basically your authority comes more from

clinical experience, from journals, from meetings. Because most of these books are dealing with anesthesia on an inpatient basis; whereas, anesthesia on an outpatient basis is an entirely different piece altogether.

*Q.* Do you rely on any medical text book as your authority for anesthesia?

*Mr. Gruber [defendants' counsel]:* Well, your Honor, wait a minute now; I think that if he was to ask him did he rely in this case, it may be proper, but if he is asking him if he ever read a text book—

*The Court:* That's not the question.

*Mr. Peisner:* That's not the question.

*Mr. Gruber:* Well, then, I will state the objection on these grounds; that excepting this case, nothing else is material. We are talking about one patient and one case. And if he relied on anything for that, I suppose he is entitled to ask him. But whether he—I don't see the materiality or relevancy—

*The Court:* Well, it could be material and relevant, unless he treats each patient differently. We will take the answer.

*A.* Would you repeat your question?

*Q. (By Mr. Peisner, continuing):* What is the authority you rely on then for the administration of anesthetic, generally speaking?

*A.* In your office?

*Q.* You, yourself.

*A.* Clinical experience, Dripps, Eckendouf and Vandam.

*Q.* How do you spell that?

*A.* D-r-i-p-p-s, V-a-n-d-a-m.

*Q.* Yes. Any others?

*A.* To a good extent there are parts from many journals which discuss and go over various forms of administering an outpatient general anesthetic.

*Q.* Any text books other than that one by Vandam?

*A.* We read through, have looked at our texts. Do you want me to list all the texts I've looked at?

*Q.* Well, the ones that you rely on.

*A.* Well, I don't understand what you mean, rely on.

*Q.* Rely on as the authority that you studied from, and whose information and instructions are —form the basis for your administration of a general anesthetic.

*A.* Well, like I said, the basis of these books are on inpatient, and you are dealing with outpatient and you must modify it, therefore.

*Q.* All right. With such modifications, what would you rely on other than Vandam?

*A.* I've read Monheim's book.

*Q.* Do you rely on it?

*A.* As much as I rely on a journal.

*Q.* Any others?

*A.* Offhand, I can't think of the names of the different books.

*Q.* How about Adrian Nuy's book?

*A.* Once again, Adrian Nuy's book was not stressed, because we stress, basically, if you are going to deal with pharmacology which is what he deals with by and large, we would go to other texts such as Goodman and—Bess and Taylor. There are other books in the same area, or similar areas.

*Q.* But you do rely on Vandam and Monheim?

*A.* I rely on them, yes, for basic principles which must be then expounded on as far as how they suit the patient or the situation.

*Q.* To the same extent, you also rely on the Principle of Anesthesia by Vincent Collins?

*A.* No. I have to—honestly must admit that I'd never really spent that much time with that book.

*Q.* The book you refer to by Vandam is Introduction to Anesthesia, by three authors, Dripps, Eckendouf and Vandam?

*A.* Yes.

*Q.* In order that there won't be any question about it, I'll show you the flyleaf of it. It's Introduction to Anesthesia, The Principles of Safe Practice. And the authors are Robert D. Dripps, James E. Eckendouf, and Leroy D. Vandam; is that correct?

*A.* Yes.

*Q.* I will read you, from page 179—

*Mr. Gruber:* Just a minute.

Your Honor, once again we are right back to where we started from. I don't think a proper foundation has been laid. The question has not been asked or answered as to whether or not this book, or any other book for that matter, was relied on in the treatment of the plaintiff in this case. And unless it was I don't think there is a foundation for it.

*Mr. Peisner:* Shall I answer that, your Honor?

*The Court:* Go ahead.

*Mr. Peisner:* Well, to begin with, I believe Mr. Gruber is contradicting himself.

When he was examining the doctor this morning he asked him about his general procedures in the office with every patient he had. And when I asked him to restrict himself to this one patient I was overruled, because the court felt that his entire procedures as to all of the patients was material, and we should take it.

Therefore, Mr. Gruber is now trying to contradict himself.

*Mr. Gruber:* Well, don't accuse Mr. Gruber of trying or not trying anything. We are talking about an entirely different matter, Mr. Peisner. I think you should respond to this motion.

*Mr. Peisner:* Now, this motion—this objection, in and of itself—the doctor relies—said that he does rely on this book. He made no qualifications of this. And I hardly think it necessary to ask him if he administers anesthetic one way to one patient and another way to another patient. If he relies on it, he relies on it.

*Mr. Gruber:* As a matter of fact, maybe you should ask that question.

*The Court:* Well, he said he relies on this book as an authority.

Now, let me ask you this: Is this book an authority?

*The Witness:* It is one of many.

*The Court:* Okay. And do you base your opinion upon this book, the opinions that you have experienced as to how anesthetics should be administered?

*The Witness:* Well, honestly, I don't.

*The Court:* You don't? All right.

And then I guess that answers the question then, Counsel.

Here is the law in Michigan, very precisely and concisely:

"The only circumstances under which medical books can be read in evidence are where the witness has based his opinions upon them and has referred to them as authority."

And evidently, he said he doesn't base his opinions upon that book.

*Q. (By Mr. Peisner, continuing):* Let me get this straight, doctor:

You have recognized this book as an authority you say you rely on?

*A.* May I say something?

*Mr. Gruber:* Wait a minute.

Your Honor, how many times is he going to be allowed to ask the same things? Now, we have had a ruling on this three separate times.

*The Court:* Yes, I sustained his objection.

*Mr. Peisner:* I just want to see if the doctor wants to contradict himself in that matter.

*Mr. Gruber:* You are testifying. He hasn't contradicted himself at all. I move the jury be advised to disregard that remark.

*The Court:* The remark may be stricken. It is improper.

*Mr. Peisner:* All right.

*Q. (By Mr. Peisner, continuing):* I will ask you, on the book—on Mr. Monheim's book, which you said you did rely on—

*A.* Mr. Gruber, it's—

*Mr. Gruber:* How—

*A.* When I say I rely upon it, do I also—I also rely upon the training I received for six months in anesthesia. Now, that's not in book form. I rely upon the training I learned from other people, that is also not in book form. I cannot dogmatically say that I do A, B and C according to Dr. Monheim's book, because there are variations which you are not even asking me about.

*Q.* We will get to them in a moment.

*Mr. Gruber:* Your Honor, again, and for the same reasons without having to go any further, I move that he not be allowed to proceed on the basis of these books. The doctor has answered. If

we are going to get every possible book on anesthesia from some medical library, go through the same things, we are going to be here all day.

*Mr. Peisner:* Well, we have covered the book on Vandam. I want to cover the book on Monheim.

*Mr. Gruber:* He has already answered that.

*Mr. Peisner:* I didn't hear any answer other than yours, Mr. Gruber.

*The Court:* Well, he hasn't testified yet that he bases his opinions upon them and has referred to them as authorities. It's one or the other in some cases.

*Mr. Peisner:* That's what I was about to ask him.

*Mr. Gruber:* Well, he just said he didn't.

*Mr. Peisner:* Well, we are discussing the Vandam book.

*The Court:* Good. Ask the question. I will permit him to ask the question.

*Q. (By Mr. Peisner, continuing):* Do you base your opinion on the Monheim book?

*A.* Are you asking solely?

*Q.* Well, in the context of what you said. You said that you got your training from observation, from experience, from other instructors, and also on books to the extent that you use books. Do you base your opinion to that extent on the Monheim book?

*A.* I base my opinion primarily upon the clinical approach to, which is learned through our residency, because obviously, just because you can sit down and read the book, that doesn't mean you can go out and give an anesthetic. So you must base your opinions, by and large, on what is clinically done in the field, what is currently being used in offices, what is currently being talked about and discussed and being worked in the hospital. That, more than a book. This is the way

the people come in. This is where your patient comes in. You can't treat everything the way the book says, A, B and C, and just totally disregard the patient as though they don't exist, just because the book says it.

*Q.* But you are not answering my question, doctor, and I'll ask that the answer be stricken because it is not responsive.

*Mr. Gruber:* Wait a minute.

*The Court:* I think it was his response to the question. The answer may stand.

*Q. (By Mr. Peisner, continuing):* Doctor, I will ask you once again: To the extent that you base your opinion on any book, do you base it on this Monheim book?

*A.* Not that book specifically. I'm sorry, I can't honestly say that.

*Q.* Do you base your opinion on any book?

*A.* You are asking me what percentage of my opinion is based on a book, and what percentage is clinical.

*Mr. Gruber:* Opinion as to what? I mean we are getting so far—

*The Court:* As to his administration of anesthetics, obviously. That is what we are talking about.

*Mr. Gruber:* I'm not sure.

*The Court:* That is what we are talking about?

*Mr. Peisner:* That's what we are talking about.

*The Court:* I would assume that's what this case is about.

*Q. (By Mr. Peisner, continuing):* All right, can you answer that, doctor?

*A.* I can't say that I do, because in many books— Just for one isolated instance, many authorities will say a certain larygoscope is the best, and they are very dogmatic about that. Now, if you do not avail yourself—

*Q.* I'm not talking about equipment, I'm talking about basic—

*A.* Equipment is in the books.

*Q.* I'm talking about as to the extent that you base your opinion, and your authority on basic principles of the administration of anesthetics. I'm not talking about equipment, I'm not talking about specific drugs, not specific techniques; basic principles—

*A.* I think it is the sum total of all these things.

*Q.* Well, to the extent that you base on any book—

*A.* I can't—

*Q.* —do you have any book that you base your opinion on?

*A.* I don't think you can specifically say one book; it is the sum total of your entire exposure.

*The Court:* I guess he has answered the question, counsel.